# UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

|  |  |
|---|---|
| In re: | ) |
| | ) |
| DUANE L. ROBINSON, | ) |
| | ) |
| *Debtor.* | ) Case No. 05-70479-SCS |
| | ) |
| | ) |
| DOMINION VIRGINIA POWER | ) |
| | ) |
| *Plaintiff,* | ) APN 05-07029-SCS |
| | ) |
| v. | ) |
| | ) |
| DUANE L. ROBINSON | ) |
| | ) |
| | ) Chapter 7 |
| *Defendant.* | ) |

## MEMORANDUM OPINION

This matter came on for trial on January 25, 2006, upon the Complaint by Dominion Virginia Power to Determine Non-Dischargeability of Debt Pursuant to § 523 of the Bankruptcy Code. At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and the pleadings submitted, the Court makes the following findings of fact and conclusions of law.

I.
## PARTIES AND PROCEDURAL HISTORY

Duane L. Robinson ("Robinson") filed under Chapter 7 of the Bankruptcy Code on

January 31, 2005. Dominion Virginia Power ("Dominion") filed an adversary complaint on

April 6, 2005 (the "Complaint") to determine the nondischargeability of certain debt owed

to Dominion by Robinson. The Complaint alleges that Robinson owes Dominion $4,056.29

for unauthorized usage of electricity. Pl. Compl., at 4. Further, the Complaint alleges that

this unauthorized usage is an "Energy Theft Debt" and should be nondischargeable pursuant

to § 523(a)(2) and § 523(a)(6) of the Bankruptcy Code. *Id.* at 5. Robinson filed an Answer

to the Complaint on April 19, 2005 (the "Answer") whereby he denied that he engaged in

energy theft or meter tampering. Def. Ans., at 1.

The trial in this case was originally scheduled for October 19, 2005; however, on

September 29, 2005 Dominion filed a Motion for Summary Judgment. This Court heard the

Motion for Summary Judgment on October 19, 2005 and denied the Motion on the grounds

that "there [were] material factual issues in dispute that would influence the Court in its

conclusion as to whether there [was] fraudulent intent or willful and malicious injury

shown." Summary Judgment Hearing Tr., October 19, 2005, at 48. Further, the Court set

the matter for trial on January 25, 2006.[1] Dominion filed its list of Exhibits on January 13,

---

[1] At the Summary Judgment Hearing, counsel for Dominion stated that Dominion was no
longer pursuing one of the two possible § 523(a)(6) claims. Under § 523(a)(6), Dominion must
prove willful and malicious injury by Robinson to the property of Dominion (the meter) or
willful and malicious injury to the entity (Dominion). Counsel stated that Dominion was no
longer pursuing non-dischargeability on the basis of injury to property because Dominion was

2

2006 and the exhibits were admitted into evidence as they were not objected to.[2]

Dominion's witness list, filed with this Court on January 13, 2006, included Susan

McAllister, Dominion Credit Administrator; David Yeager, Dominion Service Technician;

Barbara Bronson, Supervisor of Dominion Revenue Protection; Duane Robinson, the

Defendant; and any other additional witnesses necessary for rebuttal purposes. However,

Susan McAllister and Robinson were the only two witnesses who testified at trial. Prior to

trial, on January 24, 2005, the parties agreed to the following joint stipulation of facts:

> In or about January 2004, Dominion discovered the meter for the
> Defendant's residence had been illegally tampered with, resulting in no
> utility being recorded for the Defendant's residence from June 2001 through
> January 2004 as a result of a potential link being manually removed.
> Dominion did not remove the potential link. The parties acknowledge that

---

unable to obtain sufficient evidence to prove that Robinson actually tampered with the meter.
Therefore, this Court will only consider Dominion's § 523(a)(6) claim with regard to injury to
Dominion.

[2] Plaintiff's Exhibit List included Exhibits 1-11. Exhibit 1 is account documents; Exhibit
2 is Dominion's Terms and Conditions ("Tariffs"); Exhibit 3 is Service/Field Order remarks;
Exhibit 4 is the February 1, 2005 letter to Robinson; Exhibit 5 is Dominion's Investigated Energy
Theft Summary of Related Charges; Exhibit 6 is the Meter Billing History for the prior tenant;
Exhibit 7 is a Form Invoice issued by Dominion since January 2003; Exhibit 8 is Excerpts from
the Deposition Transcript of Robinson; Exhibit 9 is the January 18, 2005 letter that Robinson
sent to Dominion; Exhibit 10 is Robinson's Response to Plaintiff's First Set of Requests for
Admission ("Plaintiff's Interrogatories"); and Exhibit 11 is Excerpts from Deposition Transcript
of Robinson.
   During the trial, Dominion requested that it be allowed to introduce an internal newsletter
on meter tampering into evidence. The newsletter titled "Energy Diversion Case of the Month"
(the "Case") was admitted into evidence as Plaintiff's Exhibit 12. Initially counsel for Robinson
objected to the Case being introduced into evidence because he was not given a copy of it prior to
trial nor did counsel for Dominion give him a copy of the Case at trial. Counsel for Dominion
argued the Case should be admitted into evidence as a business record and counsel for Robinson,
after being shown the Case, stated he had no objection to the Case being admitted into evidence.
Therefore, the Case was admitted as Plaintiff's Exhibit 12.

anyone could have had access to the meter for the Defendant's residence.

Stipulations of Fact, at 1-2.

## II.
## FINDINGS OF FACT

On or about June 25, 2001, Robinson opened an account with Dominion in order to
receive electricity service for his residence located at 301 Chautauqua Avenue, Apartment
1, Portsmouth, Virginia 23707 (the "Service Address"). On or about January 2004,
Dominion discovered the meter for the Service Address had been tampered with and directed
a service technician to replace the meter. Upon examining the meter, Dominion discovered
that a link on the back of the meter had been tampered with and the meter was not properly
registering the actual electricity consumed at the Service Address.

Sometime between 2004 and 2005, Dominion informed Robinson that he owed
Dominion $4,056.29 for this unregistered electricity consumption.[3] After Dominion
informed Robinson of this debt, he called Dominion and requested a breakdown of the

---

[3] While it is undisputed that Dominion discovered the meter tampering around January
2004, this Court is unable to determine exactly when Robinson was told of the $4,056.29 debt.
McAllister's testimony regarding when Dominion first contacted Robinson is ambiguous.
Counsel for Robinson asked McAllister whether Robinson was contacted in early 2004 and
McAllister testified "yes." Tr. at 35. Counsel for Robinson then followed-up his question about
whether Robinson was contacted in early 2004 by asking, "is that correct, or early 2005?,"
whereby McAllister responded "[w]e contacted him in 2005." *Id.*

Robinson did not testify regarding the exact date he was first contacted by Dominion
about the debt; however, he acknowledged the debt in a letter he wrote to Dominion on January
18, 2005. Pl. Exh. 9. In the letter Robinson wrote to Dominion acknowledging the debt,
Robinson stated, "I have been notified via a letter that I owe a balance of $4056.39." *Id.* Further,
Robinson testified that when he first learned of the debt, he requested a breakdown of the
charges. In addition, it was after he received this breakdown of the charges that he sent the
January 18, 2005 letter. Therefore, Dominion must have initially contacted Robinson sometime
after January 2004 and prior to January 18, 2005.

charges. Dominion provided Robinson with a breakdown of the charges per his request, and on January 18, 2005, Robinson sent a letter to Dominion whereby he acknowledged the $4,056.29 debt but stated that he was financially unable to pay the entire balance in a lump sum and requested a payment plan.[4] Pl. Exh. 9.

On January 31, 2005, Robinson filed for relief pursuant to Chapter 7 of the Bankruptcy Code. He listed Dominion on his Schedule F as holding an unsecured nonpriority claim in the amount of $4,056.39. Dominion sent Robinson a letter on February 1, 2005, which stated that Robinson owed $4,056.29 for "unauthorized use of electric service" ("Dominion Debt") and stated that if Robinson did not pay the requested amount by February 10, 2005, his electricity service would be disconnected. Pl. Exh. 4. Dominion filed this adversary proceeding on April 6, 2005 and requested that the Court determine the Dominion Debt to be nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).

### A.
### Dominion's Records for the Service Address

It is uncontested that Robinson moved into the Service Address in June of 2001; however, Dominion's records are unclear regarding when the Service Address was vacant and/or occupied prior to June 2001. According to Dominion, its records reflect that from February 2000 to approximately October 2000 there was a different account holder residing

---

[4] In his letter to Dominion, Robinson stated, "I do not deny this debt." Pl. Exh. 9. While Robinson admitted the debt in the letter, he did not reference "energy theft" in the letter. Therefore, the Court concludes the letter is only evidence that Robinson admits that he owes a debt for non-billed for electricity usage and the letter is not evidence of an admission or denial of the "energy theft" charge.

at the Service Address and Dominion submitted Plaintiff's Exhibit Six as evidence of this

other account holder's billing records. Pl. Exh. 6.  Further, Dominion submitted Plaintiff's

Exhibit One as evidence of Robinson's account usage, billing records, payment records and

meter readings.  Pl. Exh. 1; Tr. at 5.  However, it is unclear to this Court why Plaintiff's

Exhibit One, which is allegedly the billing records for Robinson, reflects bills for March 30,

2000 through October 25, 2000.  Pl. Exh. 1, at 08.  It is uncontested that said billing dates

occurred prior to Robinson residing at the Service Address and that Robinson did not move

into the Service Address until June 2001.

Nevertheless, Dominion's Exhibit One begins with the monthly billing date of March

30, 2000.  Pl. Exh. 1, at 08.  Further, Exhibit One depicts monthly billing dates from March

30, 2000 through October 25, 2000, but then has a gap period in the billing history ("gap

period") and Plaintiff's Exhibit One skips from the October 25, 2000 billing date to a July

31, 2003 billing date.[5]  *Id.*

---

[5] Dominion's Exhibit One, in relevant part, is included to illustrate this gap period:

| Date | Meter Read | Use | Total Amt |
|------|-----------|-----|-----------|
| 02/02/04 | 895 | 895 | 83.32 |
| 01/05/04 | 76884 | 0 | 8.40 |
| 12/03/03 | 76884 | 0 | 8.40 |
| 10/29/03 | 76884 | 0 | 8.40 |
| 09/30/03 | 76884 | 0 | 8.40 |
| 08/29/03 | 76884 | 0 | 8.40 |
| 07/31/03 | 76884 | 0 | 8.40 |
| 10/25/00 | 76160 | 277 | 27.85 |
| 09/29/00 | 75883 | 717 | 61.91 |
| 08/31/00 | 75166 | 741 | 63.77 |
| 08/01/00 | 74425 | 831 | 71.05 |
| 07/01/00 | 73594 | 278 | 27.92 |

Susan McAllister, Credit Administrator for the Revenue Protection Department of Dominion ("McAllister"), testified that Dominion issues its customers computer generated invoices each month. Further, she testified that the gap period reflected in the account documents is due to a programmer error that deleted the computer records.[6] She also testified that Dominion does not know how the error occurred, when the error occurred, or who the programmer was that caused the error. Additionally, McAllister stated that Dominion investigated the gap period in the records but Dominion determined because of the error that it could not bring up the account history through its computer archives. Therefore, Dominion was unable to present to the Court any written evidence regarding Dominion's billing records for the Service Address during the gap period and there is no documentary evidence as to the electricity usage or billing amounts for the Service Address for this approximately two and one-half year period.

## B.
## Meter Tampering

It is not entirely clear to this Court how Dominion discovered Robinson's meter had been tampered with; nevertheless, the uncontested evidence shows that Dominion determined

| | | | |
|---|---|---|---|
| 06/01/00 | 73315 | 172 | 19.57 |
| 05/02/00 | 73144 | 274 | 27.61 |
| 03/30/00 | 72670 | 322 | 31.33 |

Pl. Exh. 1, at 08.

[6] Robinson's account is allegedly not the only Dominion account that had information deleted from it; McAllister testified that there were other accounts during this time period where the records were deleted. Tr. at 41.

on January 12, 2004 that a link had been removed from the back of the meter associated with

the Service Address and this removal of the link caused the meter to fail to properly register

electrical usage.[7] While the parties do not dispute the fact that the meter was tampered with,

the parties do dispute the facts regarding who tampered with the meter and when the meter

was tampered with.

McAllister testified that the reason Dominion believes Robinson is responsible for the

meter tampering is because Robinson benefitted from the tampering. However, Dominion

stipulated to the fact "that anyone could have had access to the meter for the Defendant's

residence." Stipulations of Fact, at 1. Further, Dominion admitted it has no concrete or

physical evidence that Robinson actually is the one who tampered with the meter. When

questioned at trial, Robinson admitted that he benefitted from the meter failing to register

electricity, but he denied that he engaged in meter tampering.

According to Dominion, Robinson's meter was the only meter tampered with at the

complex where the Service Address is located and the type of tampering that occurred,

whereby a link was removed from the meter, is a very specific form of tampering and the

---

[7] The "Service/Field Order Remarks" submitted to the Court as Plaintiff's Exhibit Three
provide that at some point on or before January 12, 2004, Dominion created a service order
which requested the service technician to check for a non-recording meter or meter tampering at
the Service Address. Pl. Exh. 3. Therefore, while the facts are not entirely clear regarding how
Dominion became aware of the non-recording meter, the facts clearly reveal that in early 2004
Dominion sent a service technician to check on the meter because Dominion became concerned
the meter was not properly registering service.

8

result of intentional tampering.[8]   McAllister stated that for a link to be removed from a

meter, the meter would have to be physically taken from the meter base and a screwdriver

would be necessary to unscrew the link. Tr. at 11. She further testified that this type of

tampering is not something a novice person or layperson could do without knowledge or skill

of utility meters;[9] however, Dominion did not present any evidence that suggests Robinson

has such sophisticated knowledge. In fact, Robinson testified that he is trained as a nurse and

has no technical or electrical experience. Further, Robinson's testimony reveals that there

are approximately 12 meters total in his complex, he lives approximately 500 feet away from

the meters, and the meter associated with his Service Address is in plain view from the

sidewalk and accessible to others.

There was no evidence presented at trial that reflects exactly when the meter

tampering occurred. According to the testimony of McAllister, Dominion believes that the

meter tampering occurred around the time Robinson moved into the Service Address;

however, Dominion does not have any records that specifically reflect when the tampering

occurred. Tr. at 37. Dominion believes the tampering occurred sometime after October 25,

2000, as Dominion alleges that its billing records reveal that the meter was properly

---

[8] At trial, Dominion introduced the "Energy Diversion Case of the Month" (the "Case"),
which was admitted into evidence as Plaintiff's Exhibit 12. The Case is a copy of a monthly
newsletter item that Dominion created to educate its employees about specific forms of meter
tampering. This particular Case was designed to educate Dominion employees about the type of
meter tampering that is alleged to have occurred in the present case. Pl. Exh. 12.

[9] McAllister testified that it is her experience that people could be severely injured if they
tamper with a meter and do not know what they are doing. Tr. at 39.

9

registering electricity until around October 25, 2000. Pl. Exh. 1. Additionally, Dominion

believes that October 25, 2000 is the date on which the prior tenant at the Service Address

terminated service with Dominion; however, McAllister admitted that Dominion cannot

determine the exact date when the prior tenant moved out of the Service Address because of

the deletion of the records. Tr. at 28. Dominion further alleges that the Service Address was

vacant between the date when the prior tenant moved out and June of 2001 when Robinson

moved in; however, McAllister admitted that because of the missing records it is impossible

for Dominion to determine exactly when the apartment became vacant. *Id.* at 43.

Additionally, McAllister testified that after Dominion replaced the tampered meter in

January 2004 with a new meter, Dominion performed a reading on the tampered meter.

Further, McAllister stated that this meter reading reflected that approximately only 700

kilowatts were used between October 25, 2000 and the January 2004 date when the meter

was replaced. She also testified that 700 kilowatts reflects approximately only a month's

usage. Tr. at 8. However, according to Dominion's account records, there were months

when the prior tenant only used approximately 200 or 300 kilowatts.[10] Pl. Exh. 6.

Under the evidence presented at trial, there is no way to determine exactly when the

meter tampering occurred. It could have occurred during the six to eight month time period

when the apartment was supposedly vacant in 2000. McAllister testified that Dominion does

---

[10] Plaintiff's Exhibit Six, which is the prior account holder's billing record, reveals that
while he was billed for 700 to 800 kilowatts some months that there were other months that he
was he billed for less kilowatts. For example, in June 2000, the prior tenant was billed for 172
kilowatts and in July 2000 he was billed for 278 kilowatts. Pl. Exh. 6.

10

not know if the landlord showed the apartment to potential tenants, and consequentially

admitted that Dominion would not know whether a potential tenant thus tampered with the

meter. Tr. at 29. Additionally, McAllister admitted that because of the gap in the records,

Dominion does not know whether there was any usage, legal or illegal, during the months

the Service Address was supposedly vacant. Tr. at 38. Further, McAllister testified that the

only thing that leads Dominion to conclude Robinson is the responsible party is because he

benefitted from the meter tampering. *Id.*

## C.
### Robinson's Electric Bills

The parties stipulated to the fact that no utility usage was recorded for the Service

Address from June 2001 through January 2004. Stipulations of Fact, at 1. However, because

of the deletion of the records, Dominion was unable to produce any written evidence

regarding what, if anything, Dominion billed Robinson for gap period between June 2001

to July 2003. The only written evidence that Dominion submitted regarding Robinson's

electrical bills commences with the billing date of July 31, 2003. Pl. Exh. 1, at 08.

Dominion's billing records indicate that Robinson's electrical bills were only $8.40 per

billing period for July 2003 through January 2004 and that the bills reflected zero electrical

usage during that time. *Id.* McAllister testified that a bill for $8.40 indicates that Dominion

is billing the customer only the basic flat customer usage fee of $8.40. She also testified that

a bill in said amount depicts that the meter was not registering any electrical usage for the

customer during the billing period. Further, Dominion's records indicate that after the meter

11

was replaced in January 2004, Robinson's next bill was for $83.32 and Dominion's records indicate that he used 895 kilowatts during that billing period. *Id.*

Because of the programmer error, there is no way for the Court to determine exactly what Robinson was billed during the gap period. McAllister alleges that from June 2001 to July 2003, Robinson should have been receiving invoices for $8.40 from Dominion and that said invoices should have reflected zero electrical usage for the meter at the Service Address. Tr. at 23. However, McAllister admitted that because of the deletion in records there is no written evidence or computer records to indicate what, if anything, Robinson was billed before July 2003. Tr. at 42. Further, she admitted that the only thing that substantiates the fact that Robinson was ever billed by Dominion is her belief that Dominion bills every customer monthly. *Id.* However, Robinson admitted that he received electrical bills from Dominion during the gap period. Therefore, the dispute is not over whether or not Robinson was billed but rather over the amount of the bills. Further, because the evidence provides that Robinson received bills for $8.40 from Dominion between July 2003 and January 2004, the inquiry may be narrowed to what Robinson was billed (or not billed) during the gap period.

Dominion argued that from June 25, 2001 through January 2004, Robinson never received a utility bill from Dominion which was higher than $10 per month; however, Robinson disputed this fact.[11] Robinson stated during his Deposition conducted by Dominion

---

[11] Robinson, in his answer to Plaintiff's Interrogatories, denied the assertion that he had never received a utility bill from Dominion from June 25, 2001 through January 2004 that was

12

("Deposition") that he recalled his average electric bill to be around $30 per month in 2003.

Pl. Exh. 11, at 15.   At trial, Dominion attempted to contradict Robinson's Deposition

testimony by referring Robinson to Plaintiff's Exhibit 1, which reflects that Robinson's

electric bill was $8.40 per month for the period from July 31, 2003 to January 05, 2004. Pl.

Exh. 1, at 08-09.[12] However, Robinson testified at trial that he thought he was being truthful

when he answered the Plaintiff's Interrogatories and the questions during the Deposition.

He further stated that he answered the questions from memory because he no longer has

records of these bills. Robinson also testified that he always paid his electric bill in cash and

that he always shred his electric bill upon receipt of the next month(s) bill.  In addition,

Robinson stated that he never paid much attention to his electrical bill and he assumed

Dominion was billing him for the correct amount.

### D.
### Servicing the Meter

McAllister testified that Dominion determines the amount of electrical consumption

that a customer is utilizing through a human meter reader.  Every month a meter reader from

Dominion goes to each house or apartment and reads the meter associated with the dwelling

unit.  Dominion admitted at trial that it is not always the same person who reads the meter

---

higher than $10 per month. Pl. Exh. 10, Interrogatory No. 3, at 4.

[12] Counsel for Dominion referred Robinson to Plaintiff's Exhibit One and asked
Robinson to explain the 8.40 bills from July 31, 2000 to January 1, 2004; however, the Court
ruled that there was no basis for Robinson to have to explain the account records since the
records belong to Dominion.

each month and that the meter reader uses a hand-held machine to read the meter. Further, McAllister stated that the meter reader, when doing his monthly reading of the meter, would not have any information showing the previous month's meter reading. Tr. at 27.

The evidence is unclear as to why it took Dominion until January of 2004 to determine the meter at the Service Address was not properly recording usage. McAllister did not testify regarding why or how Dominion learned the meter was failing to record electricity usage in January 2004; however, McAllister testified that prior to 2005, Dominion did not have a formal method of tracking unauthorized usage. Tr. at 24. She further testified that Dominion has millions of customers and that it is not unusual for accounts to register zero usage for a period of time; thus, there were no flags raised by the zero usage. Tr. at 23. McAllister also testified Dominion now has set procedures for checking on accounts that register zero usage, but that these procedures did not exist during the period when Robinson's unrecorded electricity usage was occurring. In fact, in January 2005, Dominion created the Revenue Protection Department (the "Department").[13] The Department oversees issues regarding unauthorized use, illegal use, and non-billed utility use.

---

[13] As Plaintiff's Exhibit Twelve explains, Dominion now has a policy of instructing metering services to check for non-recording meters whenever an active account shows zero KWh usage for three months. Pl. Exh. 12. However, McAllister's testimony makes it clear that such a policy was not in effect during the time period when Robinson's meter was not registering service. These types of policies for discovering non-recording meters are all part of the new Revenue Protection Department of Dominion, which was not formed until January 2005.

14

III.
ARGUMENTS

Dominion argues that the Dominion Debt should be non-dischargeable under §§ 523(a)(2) and (a)(6). Dominion argues the debt should be non-dischargeable under § 523(a)(2) because Robinson either tampered with the meter or had knowledge of the tampering and still continued to use Dominion's electricity. Dominion also argues Robinson's use of the unauthorized electricity constitutes fraud and/or a misrepresentation of Robinson's electricity consumption. Additionally, Dominion contends that fraud can be proven through circumstantial evidence and that the circumstantial evidence proves that Robinson is liable for fraudulent conduct. Further, Dominion argues it relied on the readings provided by the tampered meter and Robinson's subsequent payment of the electricity bill, and contends Robinson had a duty to disclose the improper billing and usage to Dominion.

Dominion argues it is entitled to judgment under § 523(a)(6) because this is a case of intentional meter tampering whereby a link was removed from the back of the meter which caused the meter to fail to register the actual electricity being consumed at the Service Address. Further, Dominion argues such tampering constitutes willful and malicious injury to Dominion, and Robinson is the only person who benefitted from the tampering. Dominion also argues that Robinson knew he was receiving un-billed for electricity and that this receipt of the electricity is proof of Robinson's intent to injury Dominion. In addition, Dominion argues that a "willful and malicious" act can be proven through circumstantial evidence and the circumstantial evidence in this case proves Robinson is liable for such a act.

15

Dominion further argues that Dominion's contract for services with its customers is governed by its *Terms and Conditions* (the "Tariffs") and the Tariffs as well as the Virginia Code § 18.2-163 (the "Virginia Code") allow for the presumption that Robinson is the party responsible for the meter tampering.[14]   Dominion argues that Robinson is liable for the debt because of paragraph E of the Tariffs, which states "[w]henever it is found that unmetered Electric Service is being used as a result of tampering, the Customer will pay to the Company an amount estimated by the Company to be sufficient to cover the Electric Service used but not recorded by the meter and not previously paid for." Pl. Exh. 2, at paragraph E.   In addition, Dominion argues the relevant part of the Virginia Code on "[t]ampering with metering device" provides for a presumption of liability because it states:

> The presence of any metering device found to have been altered, tampered with, or bypassed in a manner that would cause the metering device to inaccurately measure and register the degree, amount or quantity of service supplied or which would cause the service to be diverted from the recording apparatus of the meter shall be prima facie evidence of intent to violate and of the violation of this section by the person to whose benefit it is that such service be unmetered, unregistered or diverted.

Va. Code § 18.2-163 (2005).

Robinson admits that he received a benefit from the energy usage; however, he argues through counsel that the mere fact that he benefitted does not mean he is guilty of tampering with the meter.  Additionally, Robinson's counsel argues that every debtor benefits from a

---

[14] While Dominion argued the Tariffs and the Virginia Code create a presumption of liability, counsel for Dominion also admitted at trial, when questioned by the Court, that Dominion recognizes such state law presumptions do not apply in bankruptcy proceedings.

discharge in bankruptcy, and if the test to determine whether to discharge a debt is whether

the debtor benefitted, then no debt is dischargeable. Further, Robinson's counsel argues that

while Robinson admits that he received the benefit of the energy usage, the fact that he

received the benefit of the energy usage does not infer he had knowledge that he was

receiving the benefit; rather, Robinson assumed Dominion was billing him correctly.

Additionally, Robinson's counsel argues the duty was on Dominion, not Robinson, to notice

the meter was not registering usage properly.

Robinson also argues that he did not act willfully and maliciously. Robinson's

counsel argues that § 523(a)(6) requires a willful and malicious act and that Robinson did not

tamper with the meter or have knowledge of the tampering and thus is not liable under §

523(a)(6). Additionally, in support of the argument that Robinson did not tamper with the

meter, Robinson's counsel points to the fact that Robinson is a trained nurse with no

experience or training in electronics. He further argues that Dominion presented no evidence

that Robinson tampered with the meter and highlights the parties stipulation that anyone

could have had access to the meter as evidence that Dominion does not know who tampered

with the meter. Stipulations of Fact, at 1-2.

IV.
CONCLUSIONS OF LAW

As this Court has previously discussed, one of the most important benefits of the

Bankruptcy Code is its ability to offer a debtor a fresh start. *KMK Factoring, L.L.C. v.*

*McKnew (In re McKnew)*, 270 B.R. 593, 617 (Bankr. E.D. Va. 2001). This concept of a

17

fresh start demands courts construe exceptions to discharge narrowly. *Foley & Lardner v.*

*Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999) (citing *Century 21 Balfour Real*

*Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir. 1994)); *Rezin v. Barr (In re Barr)*, 194

B.R. 1009, 1016 (Bankr.N.D.Ill. 1996) (citing *Mayer v. Spanel Int'l., Ltd.*, 51 F.3d 670, 674

(7th Cir. 1995)). Further, this pervading goal of providing debtors with the opportunity to

gain a start fresh requires that exceptions to discharge be construed against the objecting

creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558 (1915); *In re Hunter*, 780

F.2d 1577, 1579 (11th Cir. 1986); *In re Barr*, 194 B.R. at 1016. Courts balance this belief

with the principle "perpetrators of fraud are not allowed to hide behind the skirts of the

Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213,

217 (1998)). The exceptions at issue in this case arise under § 523, which makes debts

non-dischargeable:

> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by--
> (A) false pretenses, a false representation, or actual fraud, other than a
> statement respecting the debtor's or an insider's financial condition: . . .
> (6) for willful and malicious injury by the debtor to another entity or to the
> property of another entity.

11 U.S.C. §§ 523(a)(2) and 523(a)(6) (2005).[15] The plaintiff has the burden of proof under

§ 523 and the plaintiff must prove non-dischargeability by a preponderance of the evidence.

---

[15] The citations and quotations in this Memorandum Opinion to Title 11 of the United
States Code are to those section in effect at the time Robinson's Complaint was filed, not to the
Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which took effect October
17, 2005.

*Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d

244, 249 (4th Cir. 1994); *Combs v. Richardson*, 838 F.2d 112 (4th Cir. 1988); *Whitson v.*

*Middleton* (*In re Middleton*), 100 B.R. 814, 818 (Bankr. E.D. Va. 1988). Therefore,

Dominion must prove by a preponderance of the evidence that the provisions of §§ 523(a)(2)

or 523(a)(6) apply to the case at issue.

A.
State Law Presumptions

Before this Court discusses the applicable § 523 provisions, because Dominion

argued that the allegation that Robinson engaged in "willful and malicious" conduct and/or

fraudulent conduct can be substantiated by the Tariffs and Virginia Criminal Code § 18.2-

163, this Court will start by examining these two provisions in the context of bankruptcy.[16]

It is well-settled that whether a debt is nondischargeable pursuant to §523 is governed by

federal law. *Kline's Serv. Center v. Fitzgerald* (*In re Fitzgerald*), 109 B.R. 893, 900 (Bankr.

N.D. Ind. 1989); *Mettetal v. Wilson* (*In re Mettetal*), 41 B.R. 80, 86 (Bankr. D. Tenn. 1984)

(citing *MacArthur Co. v. Crea* (*In re Crea*), 31 B.R. 239 (Bankr. D. Minn. 1983) ("[t]he

question of nondischargeability of under this section [523] is a federal question governed by

federal law"); *see also Capital Chevrolet v. Bullock* (*In re Bullock*), 322 B.R. 176, 180

---

[16] During the trial, Dominion attempted to rely on the Tariffs and the Virginia Code to
bolster its argument; however, counsel for Dominion also admitted to the Court that these
presumptions have no applicability in a bankruptcy proceeding. Therefore, this Court concludes
that counsel for Dominion conceded that these presumptions are not applicable in the present
bankruptcy case; nevertheless, for the sake of a complete record the Court will address whether
the presumptions are applicable in a bankruptcy proceeding.

(Bankr. D. Ala. 2005) (citing to the fact that "[b]ankruptcy courts have overwhelmingly rejected the proposition that a presumption contained in a state [] statute may be used to supply an element of intent in a proceeding under §523(a)(2)(A)"). The general rule is that exceptions to discharge under §523 cannot be established merely by a state statutory presumption. *See generally Brown v. Brown (In re Brown)*, 331 B.R. 243 (Bankr. W.D. Va. 2005); *Stanley H. Silverblatt Electrical Contractor, Inc. v. Marino (In re Marino)*, 139 B.R. 380 (Bankr. D.Md. 1992) (discussing §523(a)(4) and holding that the state law presumption, without more, did not satisfy the standard of proof required under the Bankruptcy Code). Thus, Dominion cannot rely upon a state law presumption or its Tariffs to establish Robinson tampered with the meter or to establish he engaged in fraudulent or willful conduct. Further, Dominion must prove that Robinson acted fraudulently or willfully and maliciously under the standard established by federal law in order to prove by a preponderance of evidence that the debt should be considered non-dischargeable.[17] *In re Mettetal*, 41 B.R. at 86.

B.
Circumstantial Evidence

Section 523(a)(2) and 523(a)(6) cases often lack direct evidence and thus the plaintiff must rely on circumstantial evidence to prove the debtor's state of mind. This Court has previously held that in § 523(a)(2) cases "direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to find . . . ." *Bowden v. Elrod (In re Bowden)*, 326 B.R. 62, 88

---

[17] Because Dominion did not present any evidence indicating that it had brought an action against Robinson in state court and received a final judgment, this Court does not have an issue where res judicata or collateral estoppel is determinative.

(Bankr. E.D. Va. 2005); *Universal Bank, N.A. v. Grause* ( *In re Grause*), 245 B.R. 95, 99

(B.A.P. 8th Cir. 2000) (quoting *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285,

1287 (8th Cir.1987)); *see also Marunaka Dainichi Co. v. Yamada* (*In re Yamada*), 197 B.R.

37, 40 (Bankr. E.D. Va. 1996); *Western Union Corp. v. Ketaner* (*In re Ketaner*), 154 B.R.

459, 465 (Bankr. E.D. Va. 1992). Further, in the context of § 523(a)(6) cases this Court has

discussed that "state of mind can be established through circumstantial evidence." *In re*

*McKnew,* 270 B.R. at 640; *Call Fed. Credit Union v. Sweeney* (*In re Sweeney*), 264 B.R. 866,

872 (Bankr. D.Ky. 2001) (citing *Harr v. Harr* (*In re Harr*), 2000 WL 620799, at *6 (Bankr.

S.D. Ohio 2000)).

Dominion admitted that it does not have any direct evidence that Robinson tampered

with the meter by stipulating to the fact that "anyone could have had access to the meter for

the Defendant's residence." Stipulations of Fact, at 2. Nevertheless, Dominion argues the

circumstantial evidence indicates that Robinson engaged in fraud and "willful and malicious"

conduct. Therefore, against this backdrop, this Court must assess whether the circumstantial

evidence demonstrates that Robinson's conduct was fraudulent and/or "willful and

malicious" by a preponderance of the evidence and thereby prohibits the discharge of

Robinson's debt to Dominion. Given that Dominion's § 523(a)(6) claim is based entirely on

circumstantial evidence and any conclusions formed by the Court in its analysis of

§ 523(a)(6) may impact the Court's § 523(a)(2) discussion, this Court will start its discussion

by examining § 523(a)(6).

21

C.
§ 523(a)(6)
*Willful and Malicious Injury*

Dominion alleges that Robinson tampered with the meter or had knowledge of such

meter tampering and thus he caused a willful and malicious injury to Dominion.[18]  While

Dominion admits that it was unable to obtain sufficient evidence to prove Robinson tampered

with the meter, Dominion argues "willful and malicious" injury to Dominion can be proven

through circumstantial evidence.  Further, Dominion alleges Robinson received unauthorized

services from Dominion and that Robinson knew he was receiving the un-billed service; thus,

Robinson intended to convert Dominion's property and he caused a willful and malicious

injury to Dominion.

Section 523(a)(6) prohibits discharge for an individual debtor from any debt "for

willful and malicious injury by the debtor to another entity or to the property of another

entity." 11 U.S.C. § 523(a)(6) (2005). The United States Supreme Court changed the

landscape of § 523(a)(6) nondischargeability proceedings in its decision *Kawaauhau v.*

*Geiger*, 523 U.S. 57 (1998).  Prior to *Geiger*, § 523(a)(6) encompassed a broad range of

conduct.  In *Branch Banking & Trust Co. of Va., Inc. v. Powers* (*In re Powers*), 227 B.R. 73

(Bankr. E.D. Va. 1998), this Court explained the prior case law:

> Courts focused on both the malice prong and the willful prong of

---

[18] As previously noted, Dominion stated at the Summary Judgment Hearing that it was
only pursuing the § 523(a)(6) claim in regards to damage to Dominion for the utility service and
that Dominion was no longer pursuing the (a)(6) claim of physical damage to the meter. *See*
*supra*, fn. 1, at 2.

22

§ 523(a)(6). The word "willful" was defined as "a deliberate or intentional
act which necessarily leads to injury." In proving intent prior to *Geiger*, the
creditor was only required to show the debtor's act was intentional; there
was no requirement to show that the injury was intended. When an act, such
as conversion, was done intentionally and produced harm without just cause
or excuse, it was willful and malicious for purposes of § 523(a)(6), without
proof of a specific intent to injure. Intent to injure was established by
showing that the debtor intentionally performed an act which necessarily
caused injury or that was certain to ca[u]se injury.

*Id.* at 74 (citations omitted). Thus, a debtor could not discharge under § 523(a)(6) any

intentional act, which necessarily caused an injury, even if the debtor never intended the

resulting injury.

     *Geiger* substantively and dramatically changed this analysis. The defendant physician

in *Geiger* attempted to treat a patient's injured foot. 523 U.S. at 59. Notwithstanding existing

medical protocols known to Geiger, he elected to prescribe oral penicillin to reduce the

treatment cost, rather than prescribing intravenous penicillin. Later, Dr. Geiger discontinued

treatment because he believed the infection had subsided. Sadly, the less effective treatment

coupled with the subsequent withdrawal of any antibiotics failed to curtail infection and the

patient's foot required amputation. *Id.* After a substantial award to the patient in a

malpractice action against Geiger, Geiger filed bankruptcy. *Id.* at 59-60.   The patient

sought to except his judgment from discharge under § 523(a)(6). *Id.* at 60. The Supreme

Court concluded the language of § 523(a)(6) encompassed only acts done with the actual

intent to cause injury, and not merely intentional acts that happen to cause injury:

The word "willful" in (a)(6) modifies the word "injury," indicating that
nondischargeability takes a deliberate or intentional injury, not merely a

23

> deliberate or intentional act that leads to injury. Had Congress meant to
> exempt debts resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury." Or, Congress might have
> selected an additional word or words, i.e., "reckless" or "negligent," to
> modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6)
> formulation triggers in the lawyer's mind the category "intentional torts," as
> distinguished from negligent or reckless torts. Intentional torts generally
> require that the actor intend *the consequences of an act*," *not simply "the
> act itself."*

*Id.* at 61-62 (citing Restatement (Second) of Torts § 8A cmt. a (1964)). The Supreme Court

feared acceptance of a more expansive interpretation of § 523(a)(6) would stretch the breadth

of exceptions to discharge too far:

> The Kawaauhaus' more encompassing interpretation could place within the
> excepted category a wide range of situations in which an act is intentional,
> but injury is unintended, i.e., neither desired nor in fact anticipated by the
> debtor. Every traffic accident stemming from an initial intentional act--for
> example, intentionally rotating the wheel of an automobile to make a
> left-hand turn without first checking oncoming traffic--could fit the
> description. A "knowing breach of contract" could also qualify. A
> construction so broad would be incompatible with "well-known" guide that
> exceptions to discharge "should be confined to those plainly expressed."

*Id.* at 62 (citations omitted).

In *Geiger*, however, the Supreme Court cited with approval two of its prior decisions,

which concerned conversion of a creditors' property,[19] clarifying that to find a conversion

non-dischargeable, there must be an intentional injury. Furthermore, the Supreme Court

reminded that, with reference to claims of conversion, "not every tort judgment for

conversion is exempt from discharge."

---

[19] *McIntyre v. Kavanaugh*, 242 U.S. 138 (1916); *Davis v. Aetna Acceptance Co.*, 293 U.S.
328 (1934).

24

There is no doubt that an act of conversion, if willful and malicious, is an injury . . . within the scope of this exception . . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

*Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 332 (1934).

Decisions shortly after *Geiger* concluded that § 523(a)(6) required a showing of an intentional tort with a subjective standard of intent. *In re Powers*, decided by this Court, is illustrative. *Branch Banking & Trust Co. of Va. v. Powers* (*In re Powers*), 227 B.R. 73 (Bankr. E.D. Va. 1998). The debtor, Powers, obtained a loan from the plaintiff bank, and pledged his securities portfolio account maintained at a brokerage institution as collateral for the indebtedness. *Id.* at 74. Powers later obtained financing from a second bank to purchase a construction company, which required him to pledge the same securities. When Powers defaulted on the second loan, he delivered possession of the securities to the second bank, who liquidated the account. The plaintiff sought to deny discharge of Powers' debt to the first bank under § 523(a)(6). This Court concluded the debt was dischargeable in light of *Geiger*:

Likewise, this Court must apply a subjective standard of intent and determine whether the debtor, Stewart M. Powers, intended to cause injury to the plaintiff, BB & T, by delivering his Portfolio Account to First Union when BB & T had a prior security interest in the account. First, the Court must examine the intentional acts of the defendant. The defendant stipulated that he directed Paine Webber to deliver his Portfolio Account to

25

First Union without advising BB & T. The defendant's transfer of funds was an intentional act done to subordinate the plaintiff's interest in the Portfolio Account to that of First Union. However, the debtor's intentional transfer of the plaintiff's collateral to First Union standing alone is not enough to satisfy the requirements of § 523(a)(6), when he asserted that the subordination would not injure BB & T's chances of being paid in full as he intended to pay its loan off over time. The debtor also expected to pay the First Union loan according to its terms which would have the effect of restoring the collateral to BB & T.

. . .

Clearly, the defendant's act of subordinating the plaintiff's interests in his Portfolio Account was an improper act, but the Court is bound by the subjective intent of the debtor in determining whether the injury to the plaintiff was intended. However, the defendant's intent was to pay the plaintiff the balance due it, even though he subordinated its interest to First Union.

*Id.* at 76-77; *see also Roumeliotis v. Popa (In re Popa)*, 140 F.3d 317, 318 (1st Cir. 1998) (holding that although an employer's failure to carry worker's compensation insurance was an intentional act that caused injury, it was not done with the actual intent to cause the injury and therefore was dischargeable); *Fla. Outdoor Equip., Inc. v. Tomlinson (In re Tomlinson)*, 220 B.R. 134, 137 (Bankr. M.D. Fla. 1998) (holding that the debtor's failure to turn over inventory proceeds pledged to a creditor to keep the business operative was not an intentional act to cause injury under § 523(a)(6)).

A subsequent case decided by the Fifth Circuit Court of Appeals advocated a slight erosion in this standard. *In Miller v. J. D. Abrams, Inc. (In re Miller)*, 15 F.3d 598 (5th Cir. 1998), cert. denied, 526 U.S. 1016 (1999), the court found the label "'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury." *Id.* at

603. Instead, the court concluded that "either objective substantial certainty or subjective

motive meets the Supreme Court's definition of 'willful injury' in §523(a)(6)." *Id.*; *accord*

*Baldwin v. Kilpatrick* (*In re Baldwin*), 245 B.R. 131, 136 (B.A.P. 9th Cir. 2000); *J. Bowers*

*Constr. Co. v. Williams* (*In re Williams*), 233 B.R. 398, 405 (Bankr. N.D. Ohio 1999).

    In an unpublished opinion, the Tenth Circuit Court of Appeals rejected the substantial

certainty approach of the Fifth Circuit, concluding that "the 'willful and malicious injury'

exception to dischargeability in § 523(a)(6) turns on the state of mind of the debtor, who

must have wished to cause injury or at least believed it was substantially certain to occur."

*Via Christi Reg'l. Med. Ctr., Inc. v. Englehart* (*In re Englehart*), No. 99-3339, 2000 WL

1275614, at *3 (10th Cir. 2000); *see also Su v. Carrillo* (*In re Su*), 259 B.R. 909, 913 (B.A.P.

9th Cir. 2001) ("The key difference between the Miller and Markowitz holdings is that

Markowitz followed the Restatement's requirement that the debtor believe that his actions

will with substantial certainty cause injury, while in Miller the subjective belief of the debtor

as to the certainty of the harm was not controlling."). Other courts following the subjective

formulation first adopted by the Eighth Circuit in *Geiger*, have scrutinized the debtor's

knowledge or belief concerning the consequences of his actions. The Sixth Circuit Court of

Appeals has articulated that "the mere fact that [the debtor] should have known his decisions

and actions put [the creditor] at risk is also insufficient to establish a 'willful and malicious

injury.'" *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 465 n.10 (6th Cir. 1999).

Instead, "[h]e must will or desire harm, or believe injury is substantially certain to occur as

a result of his behavior." *Id.*; *see Mitsubishi Motors Credit of Am., Inc. v. Longley* (*In re Longley*), 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999); *Via Christi Reg'l. Med. Ctr. v. Budig* (*In re Budig*), 240 B.R. 397, 400-01 (D. Kan. 1999); *In re Williams*, 233 B.R. at 404.

The Ninth Circuit Court of Appeals has also weighed in the post-*Geiger* analysis. In *Petralia v. Jercich* (*In re Jercich*), 238 F.3d 1202 (9th Cir. 2001), an employer withheld wages from an employee even though the employer possessed the funds to pay. The debtor argued, as had been held by the district court, that the employer must have withheld the wages with the "specific intent" of harming the employee. The Circuit Court disagreed:

> In *Geiger*, the Court did not answer the question before us today–the precise state of mind required to satisfy § 523(a)(6)'s "willful" standard. The *Geiger* Court did, however, cite with approval its prior decision of *McIntyre v. Kavanaugh* and the Restatement (Second) of Torts § 8A.

> In *McIntyre*, the debt arose from the debtor's conversion of the creditor's property. Holding that this debt was excepted from discharge under § 523(a)(6), the Court indicated that a wrongful act that is voluntarily committed with knowledge that the act is wrongful and will necessarily cause injury meets the "willful and malicious" standard of § 523(a)(6). Similarly, the Restatement definition of intent cited by the *Geiger* Court requires the actor either to desire the consequences of an act or to know the consequences are substantially certain to result. Under this definition, the actor's deliberate act with knowledge that the act is substantially certain to cause injury is sufficient to establish willful intent.

> This definition is consistent with the approach this court took in the post-*Geiger* case of *In re Bailey*, where we stated that "[t]he conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6)."

> We hold, consistent with the approaches taken by the Fifth and Sixth Circuits, that under *Geiger*, the willful injury requirement of § 523(a)(6) is

28

> met when it is shown either that the debtor had a subjective motive to inflict
> the injury or that the debtor believed that injury was substantially certain to
> occur as a result of his conduct. We believe that this holding comports with
> the purpose bankruptcy law's fundamental policy of granting discharges
> only to the honest but unfortunate debtor.

*Id.* at 1207-08.

Prior to *Geiger*, the Fourth Circuit Court of Appeals had little trouble concluding a

debtor who misappropriated or converted another's property would not receive discharge of

the obligation under § 523(a)(6) of the Bankruptcy Code. *See, e.g., St. Paul Fire & Marine*

*Ins. Co. v. Vaughan,* 779 F.2d 1003, 1009 (4th Cir. 1985) (holding that a debtor's action in

using the proceeds of a government check to buy luxury items, after he had agreed with an

insurer to place the check in an account for disbursal to the insurer, amounted to willful and

malicious injury); *First Nat'l. Bank of Md. v. Stanley (In re Stanley),* 66 F.3d 664, 667 (4th

Cir. 1995) (holding that debtor who used monies drawn from a line of credit mistakenly

increased by a bank was guilty of conversion, and such actions excepted the debt from

discharge as willful and malicious injury); *see also Pollock v. Gandara (In re Gandara),* 218

B.R. 808, 811-12 (Bankr. E.D. Va. 1997) (holding that a patient who assigned to health care

provider an interest in settlement proceeds of a personal injury action and utilized proceeds

without honoring assignment, committed willful and malicious injury); *Bodie v. Britt (In re*

*Britt),* 156 B.R. 511, 519 (Bankr. E.D. Va. 1993) (holding that a real estate agent who

withdrew escrow funds and paid them to himself committed conversion, which was

non-dischargeable under § 523(a)(6); *Scott v. Scott (In re Scott),* 203 B.R. 590, 596-97

(Bankr. E.D. Va. 1996) (retaining unearned monies remaining from six month advance of wages and spending monies after demand for their return, constitutes willful and malicious injury).

Cases subsequent to considering whether acts of conversion constitute willful and malicious injury have focused on the distinction as to whether the conversion was an intentional one or merely a reckless or negligent conversion of property. *Compare Peklar v. Ikerd (In re Paklar)*, 2001 WL 893681, at *2 (9th Cir. 2001) (finding an indebtedness dischargeable where "[the debtor's] conversion of [the creditor's] property was at worst negligent, and at best 'innocent or technical,' conversion."); *In re Budig*, 240 B.R. at 401 (holding that debtor's alleged conversion of insurance benefits assigned to medical center could not constitute willful and malicious injury "[b]ecause the debtors did not know the money belonged to Via Christi [medical center], they could not have had the necessary intent to cause willful injury") with *Labrecque v. Armada Mfg. Co.*, No. 5:98-CV-824, 1999 WL 1939980 (E.D.N.C. 1999) ("This conclusion is appropriate because [the debtor] intentionally sold the boat and kept the proceeds without [the creditor's] approval while knowing that the boat (and its proceeds) belonged to [the creditor]. Such a conversion qualifies as willful and malicious under § 523(a)(6)."); *Call Fed. Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 872 (Bankr. W.D. Ky. 2001)(finding a debtor who cashed a two party check representing insurance proceeds intended to harm credit union when he converted the monies to his own use). This discerning of a debtor's intent in the context of a conversion case is

30

particularly difficult:

> The problem with conversion cases . . . is that rarely are the debtors acting
> out of a desire to injure the creditors, even though the injury to the creditor,
> although not desired, is almost always substantially certain to result from a
> debtor's actions. Thus, the key in conversion cases is to analyze each set of
> circumstances on a case-by-case basis to determine whether the conversion
> is in the nature of an intentional tort or whether the conversion is the result
> of a negligent or reckless tort - but not willful or malicious.

*Avco Fin. Servs. of Billings v. Kidd* (*In re Kidd*), 219 B.R. 278, 284 (Bankr. D. Mont. 1998).

The distinction necessitates consideration of where a debtor's conduct falls within the broad

continuum of what may constitute acts of conversion:

> The common law tort of conversion does not fall neatly into either of
> Justice Ginsberg's categories because the conduct it reaches spans both. At
> common law, a defendant who is shown to have exercised dominion over
> a plaintiff's property is liable for the resulting conversion, even where she
> reasonably and innocently believes the property is her own. At the other
> end of the spectrum, common law conversions encompasses torts, like
> embezzlement, that are also prosecutable as crimes.

*Haemonetics v. Dupre*, 238 B.R. 224, 229 (D. Mass. 1999), *aff'd,* 229 F.3d 1133 (1st Cir.

2000) (unpublished table decision).[20]

Conversion cases also require careful consideration of the nature of the injury suffered

by the creditor when a court considers whether a debtor "intended" to cause the specific harm

---

[20] In Virginia "a person is liable for conversion for the wrongful exercise or assumption of
authority over another's goods, depriving the owner of their possession, or any act of dominion
wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons
v. Miller,* 261 Va. 561, 544 S.E.2d 666, 679 (2001) (citing *Hartzell Fan, Inc. v. Waco, Inc.,* 256
Va. 294, 505 S.E.2d 196, 201 (1998); *Bader v. Cent. Fid. Bank,* 289, 245 Va. 286, 427 S.E.2d
184, 186 (1993)).

inflicted. As one court has observed:

> The creditor's true injury occurs on an abstract level. It is the debtor's
> invasion of the creditor's legally protected right. The court should focus on
> this injury, as opposed to the resulting damage, when it asks whether the
> injury was intentional. When it does so, the answer will usually be relatively
> obvious because the debtor's action is the injury. For example, in a case
> involving assault and battery, the true injury is not the creditor's broken jaw,
> but rather, the unconsented to touching that produced the broken jaw.
> Consequently, the question to ask is not whether the debtor intended to
> break the creditor's jaw, but instead, whether the debtor intended to hit the
> creditor. In defamation cases, the true injury is not the damage to the
> creditor's reputation; it is the publication of falsehoods about the creditor
> that led to the damaged reputation. Consequently, the proper question is not
> whether the debtor intended to injure the creditor's reputation, but instead,
> whether the debtor intended to publish the defamatory remarks. Similarly,
> in the conversion of collateral scenario, the true injury is not that the
> creditor's debt goes unpaid. The true injury is that the creditor's collateral
> was wrongly or improperly disposed of and that the proceeds were used for
> purposes other than payment of the obligation that property secured.
> Consequently, the proper question is not whether the debtor intended that
> its secured creditor would go unpaid. Instead, the question to ask is whether
> the debtor intended to improperly use the creditor's collateral and/or its
> proceeds for purposes other than the payment of the debt that property
> secured. If so, there is an intentional injury.

*ABF, Inc. v. Russell (In re Russell)*, 262 B.R. 449, 454-55 (Bankr. N.D. Ind. 2001); *see also*

*Ferraro v. Ballard (In re Ballard)*, No. 00-07041-S, slip op. at 35 (Bankr E.D. Va. July 17,

2001).

Since *Geiger*, the malice prong of § 523(a)(6) appears unchanged. As Judge Tice of

this Court has explained:

> Malice does not mean the same thing for nondischargeability purposes
> under § 523(a)(6) as it does in contexts outside of bankruptcy. In
> bankruptcy, debtor may act with malice without bearing any subjective ill

32

will toward plaintiff creditor or any specific intent to injure same. *See In
re Stanley,* 66 F.3d at 667 (citing *St. Paul Fire & Marine Ins. Co. v.
Vaughn,* 779 F.2d 1003, 1008-09 (4th Cir. 1985)). The Fourth Circuit
defines malice as an act causing injury without just cause or excuse. *See In
re Powers,* 227 B. R. at 73.

Debtor's subjective mind set is central to the inquiry as to whether debtor
acted deliberately in knowing disregard of a creditor's rights in property.
In fact, a plaintiff creditor can even establish malice on an implied basis
from a showing of debtor's behavior, as well as a presentation of the
surrounding circumstances. *See St. Paul Fire & Marine Ins. Co.,* 779 F. 2d
at 1010 ("[i]mplied malice, which may be shown by the acts and conduct of
the debtor in the context of their surrounding circumstances, is sufficient
under . . . § 523(a)(6)."); *Hagan v. McNallen (In re McNallen),* 62 F. 3d
619, 625 (4th Cir. 1995). What is required is that plaintiff prove that
debtor's injurious act was done deliberately, intentionally and with knowing
disregard for plaintiff's rights. *See In re Stanley,* 66 F. 3d at 667.

*Johnson v. Davis (In re Davis),* 262 B. R. 663, 670-71 (Bankr. E.D. Va. 2001).

Finally, this Court is reminded that "[s]ince a debtor in a § 523(a)(6) case is unlikely

to admit that he or she intended to cause injury, or that he or she was substantially certain that

injury would result, this state of mind can be established through circumstantial evidence."

*In re Sweeney,* 264 B.R. at 872 (citing *Harr v. Harr (In re Harr),* 2000 WL 620799, at *6

(Bankr. S.D. Ohio 2000)).

Against this backdrop, this Court must assess whether the conduct of Robinson

constitutes "willful and malicious injury" prohibiting the discharge of Robinson's debt to

Dominion. First, accepting the parties' stipulation, this Court concludes that anyone could

have had access to meter. Stipulations of Fact, at 2. Secondly, given the fact that Dominion

stated at the Summary Judgment Hearing that Dominion was no longer pursuing the

33

§526(a)(6) claim with regard to injury to the property of Dominion because Dominion was

unable to obtain sufficient evidence to prove Robinson actually was the individual who

tampered with the meter, this Court determines that Dominion admitted that it does not have

enough evidence to determine Robinson deliberately and intentionally tampered with the

meter. Summary Judgment Hearing, at 2-3.

McAllister testified that the only reason Dominion concluded that Robinson was

responsible for the meter tampering is because he received a benefit; thus, Dominion appears

to be arguing that the mere fact that Robinson benefitted proves that he "willfully and

maliciously" injured Dominion. Further, Dominion attempted to rely on the Virginia Code

to bolster its argument that because Robinson benefitted there exists a presumption that

Robinson is liable. Counsel for Robinson does not deny that Robinson received the benefit

of the energy usage; however, he argues that the mere fact that Robinson benefitted does not

equate to a finding of liability. He further argues that if the measure of whether a debt is

dischargeable is whether the debtor benefitted from the debt, then no debt is dischargeable.

As this Court has already noted, bankruptcy courts have overwhelmingly rejected the

proposition that a presumption contained in a state statute satisfies the standard of proof

required by the Bankruptcy Code in regard to exceptions to discharge under §523. *See*

*generally Brown v. Brown* (*In re Brown*), 331 B.R. 243 (Bankr. W.D. Va. 2005); *Capital*

*Chevrolet* v. *Bullock* (*In re Bullock*), 322 B.R. 176, 180 (Bankr. M.D. Ala. 2005); *Stanley H.*

*Silverblatt Elec. Contractor, Inc. v. Marino* (*In re Marino*), 139 B.R. 380 (Bankr. D.Md.

34

1992). Further, as this Court has also already noted, while counsel for Dominion argued the Tariffs and Virginia Code allow for the presumption that Robinson is liable, counsel for Dominion admitted these presumptions do not apply in the context of bankruptcy. Therefore, this Court finds that the presumptions contained in the Tariffs and the State Code are irrelevant and have no bearing on Robinson's liability.

This Court concludes that the mere fact that the debtor benefitted is not enough to determine *per se* that the debt is non-dischargeable. After *Geiger*, courts have frequently concluded that conversion alone is not enough to prevent discharge, as conversion standing alone does not prove the debtor possessed the requisite intent. *See e.g., Kawaauhau v. Geiger (In re Geiger)* 523 U.S. 57, 64 (1998) ("not every tort judgment for conversion is exempt from discharge"); *In re Brown*, 331 B.R. at 251 (citing *In re Geiger*, 523 at 61-62) ("A willful mental state which leads to an injury will not suffice; the debtor must have intended to cause an injury."); *see also J & A Brelage v. Jones (In re Jones)*, 276 B.R. 797, 797 (Bankr. N.D. Ohio 2001) ("[W]hile an act of conversion may give rise to debt that is nondischargeable, as debt for debtor's 'willful and malicious injury' mere act of conversion is not, per se, a 'willful and malicious injury' for debt dischargeability purposes"). Therefore, this Court is not persuaded because Robinson received and utilized unmetered electricity, he thus must have intentionally or "willfully and maliciously" converted Dominion's electricity service.

The question then for this Court is not whether Robinson benefitted from the meter

35

failing to register electricity consumption, but whether Robinson intentionally tampered with

the meter or whether the receipt of the benefit was done with the intent to convert the

electrical service.  Dominion admitted that it is without sufficient evidence to prove that

Robinson tampered with the meter and McAllister testified to the fact that Dominion only

concluded Robinson was liable because he benefitted; nevertheless Dominion attempted to

argue that the circumstantial evidence proves Robinson must have engaged in meter

tampering.  These competing arguments espoused by Dominion are factually bipolar as

Dominion is essentially admitting that it cannot prove Robinson tampered with the meter yet

arguing in the same breath that the evidence indicates that he engaged in meter tampering;

the Court will nevertheless consider whether the circumstantial evidence proves by a

preponderance of the evidence that Robinson tampered with the meter.

        The circumstantial evidence presented in this case is contradictory.  Certainly, it is

rather suspicious that the meter at the Service Address registered that only 700 kilowatts were

used between October 2000 and July 2003.  Additionally, the fact that Robinson never

questioned Dominion when his electric bill went from approximately $8.00 to $80.00 in the

period of one month and the fact that he did not protest the $4,056.39 debt, casts doubt on

his innocence.  However, this is not a case where all of the circumstantial evidence is one-

sided.  For example, McAllister testified that this type of intentional tampering is not

something a novice could do without electrical knowledge and that people who do not know

what they are doing could be, and have been, seriously injured by tampering with the meter

36

in the manner that occurred here. Tr. at 39. Yet, while stating that this type of meter

tampering is deliberate and requires electrical sophistication, Dominion failed to present any

evidence which suggests Robinson possesses the requisite electrical abilities. In addition,

Robinson testified that he is a trained nurse with no electrical knowledge or background.

   While the most incriminating evidence against Robinson is the fact that the meter

allegedly stopped working sometime between the time the prior tenant moved out and the

time when he moved into the Service Address, the ability of this evidence to incriminate

Robinson is substantially diminished by the material incompleteness of the billing records

for the Service Address. As previously discussed, because of the error that resulted in

Dominion's billing records from October 25, 2000 to July 31, 2003 being deleted, it is

impossible to determine when the meter stopped registering usage and thus when the

tampering occurred. Therefore, this Court is not presented with a situation where Dominion

can prove that the meter was working properly when Robinson moved into the Service

Address and that only after Robinson moved into the residence the meter failed to register

usage. Nor is this a situation where Dominion can determine exactly when the last tenant

moved out of the Service address or rule out the possibility that a potential tenant tampered

with the meter during the time the Service Address was allegedly vacant. Tr. at 28-29. Thus,

given the facts presented in this case, the Court is unable to determine by a preponderance

of the evidence that Robinson engaged in meter tampering.

   Dominion argues that even if it cannot prove that Robinson tampered with the meter,

37

Robinson is still liable for intentionally converting Dominion's energy. Dominion further

argues that Robinson knew he was not being correctly billed for the electrical service yet he

continued to use Dominion's electricity; thus, Robinson was intentionally converting

Dominion's property and the debt should be exempt from discharge under § 523(a)(6). In

contrast, Robinson admits he benefitted from the meter failing to register electricity;

however, he argues that he had no knowledge that the meter had been tampered with nor did

he realize the meter was failing to record electricity usage. In support of the argument that

he did not realize the meter was failing to properly record electricity usage, Robinson

testified he paid his monthly electric bill without paying a lot of attention to the details. In

addition, he alleges this is the first time he has lived alone, that he did not realize his electric

bill reflected zero electrical usage, and that he paid the amount he was billed and assumed

Dominion was billing him correctly.

        Given the parties competing arguments, the question to be determined by the Court

is whether the receipt of the benefit was intentional, or merely "innocent" or "technical?"

*Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934) ("There may be a conversion

which is innocent or technical, an unauthorized assumption of dominion without willfulness

or malice."). As previously discussed, the mere fact that Robinson benefitted does not *per

se* determine that the receipt of the benefit was intentional. *In re Geiger*, 523 U.S. at 64 ("not

every tort judgment for conversion is exempt from discharge"). Since Dominion cannot

prove Robinson tampered with the meter, Dominion does not have direct proof that Robinson

38

intentionally converted the electricity; however, this Court has previously noted that "state

of mind can be established through circumstantial evidence." *In re McKnew,* 270 B.R. at

640; *In re Sweeney,* 264 B.R. at 872 (citing *Harr v. Harr* (*In re Harr*), 2000 WL 620799, at

*6 (Bankr. S.D. Ohio 2000)). Dominion alleges the totality of the circumstances, which

includes factors such as the timing of the alleged meter tampering, Robinson receiving bills

for approximately $8.40 per month, Robinson paying Dominion without ever questioning the

low dollar and usage amounts, Robinson's failure to question the electric bills after they rose

significantly once the meter was replaced, and Robinson's acceptance of the $4,056.29 debt,

constitutes sufficient circumstantial evidence to determine that Robinson caused "willful and

malicious injury" to Dominion.

    The circumstantial evidence presented in these instances, here again, is contradictory.

The evidence relied on by Dominion is countered by the gap period in the billing records,

evidentiary contradictions, and the difficulty of distinguishing between intentional and

negligent conduct when there is no direct evidence of intent.  First, this Court is not

persuaded that the timing of the alleged tampering is circumstantial evidence that Robinson

intended to convert Dominion's property.  The Court finds the timing evidence particularly

unpersuasive in light of the fact that Dominion has no billing or usage records for the Service

Address during the alleged time period of the tampering.  While Robinson stipulated to the

fact that the meter at the Service Address had been tampered with and this resulted in "no

utility being recorded for the Defendant's residence from June 2001 through January 2004,"

39

this stipulation does not preclude a finding that the meter was tampered with prior to Robinson residing at the Service Address. Stipulations of Fact, at 1. Dominion suggests that the fact that the meter only registered 700 kilowatts between October 2000 and January 2004 is evidence that the tampering must have occurred around the time Robinson moved into the Service Address; however, Dominion was unable to provide the Court with billing records for the period between October 2000 to July 2003. Further, McAllister testified that Dominion does not have anything in its file that reflects when the tampering occurred or when the Service Address was vacant.[21] Tr. at 28, 37 and 42. Given that there are no records for the Service Address between October 2000 and July 2003, this Court finds the evidence inconclusive regarding when the tampering occurred. Quite simply, it is possible the tampering could have occurred prior to Robinson residing at the Service Address which thereby makes it plausible that Robinson did not have any knowledge of the tampering.

Dominion also alleges that Robinson should have noticed his electric bills were for $8.40 and that the said bills showed zero electrical usage. Dominion further alleges that Robinson's payment of the bills and failure to contact Dominion about the inaccurate billing is evidence of Robinson's intentional conversion of Dominion's property. In contrast, Robinson argues that he did not realize the bills showed zero electrical usage and that he relied on Dominion to bill him correctly. Taken alone, this Court concludes that failure to

---

[21] Counsel for Dominion, as part of his closing argument and in response to the Court's questions, attempted to argue that the evidence establishes that the previous tenant moved out of the Service Address in October 2000. However, McAllister testified that because of the record deletion, it is impossible to tell when the property became vacant. Tr. at 28 and 42.

40

notice the electric bills demonstrated zero electrical usage merely demonstrates that Robinson

was negligent in paying attention to his bills. Further, negligence is not enough to constitute

"willful and malicious." The Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, (1998),

"held that neither negligence nor recklessness satisfies the 'willful' requirement of Section

523(a)(6). Rather, the injury must have been intended." *Chester v. Parker (In re Parker)*,

289 B.R. 779, 782 (Bankr. M.D. Ga. 2002) (citing *In re Geiger*, 523 at 64). The

incompleteness of the record makes it impossible to determine whether Robinson intended

to injure Dominion.

Robinson's evidence was also perplexing at times. Robinson stipulated to the fact that

no utility usage was recorded for the Service Address from June 2001 to January 2004; yet,

in his Deposition answer, Robinson stated that his average bill was $30.00 in 2003. Pl. Exh.

11, at 15. Further, while Dominion's billing records indicate that Robinson was only billed

$8.40 per month from July 2003 to January 2004, Robinson, in his response to Plaintiff's

Interrogatories, denied the allegation that he never received a utility bill from Dominion that

was higher than $10 per month. Pl. Exh. 10, at 4. In addition, counsel for Dominion

attempted to weaken Robinson's credibility by highlighting the fact that Robinson testified

at the Deposition that he always paid the bill when he received it and that he also paid the bill

in a timely manner while also highlighting the fact that Dominion's records reveal that

Robinson was not always timely in the payment of his electrical bill. Pl. Exh. 11, at 9-10;

Pl. Exh. 1, at 04.

41

These discrepancies are troubling to the Court; however, given the fact that Dominion is missing extensive billing records from the time period in question, the Court gives little weight to the evidence in regards to its ability to contradict Robinson. For example, there is nothing in the records to indicate what Robinson was billed before July 2003 or whether he paid his bills in a timely fashion before July 2003.[22]

Further, this Court finds reliance on Plaintiff's Exhibit One to contradict Robinson problematic because of issues concerning this document. First, as already noted, this Court is troubled by the substantial gap period reflected in Plaintiff's Exhibit One. Secondly, Dominion submitted Plaintiff's Exhibit One as evidence of Robinson's account usage, billing, payments and meter readings and Exhibit One has the name "Duane L. Robinson" in the left corner; however, the billing date depicted in the Exhibit starts on March 30, 2000, which is approximately fourteen months before Robinson allegedly moved into the Service Address.[23] Tr. at 5-6; Pl. Exh. 1, at 08.

Further, even assuming Robinson realized his electric bills were for unusually small sums of money and chose not to question it or contact Dominion about it, that alone would

---

[22] For example, since the invoices between October 2000 and June 2003 were deleted, there is no way to conclusively establish the exact amount of Robinson's electric bills for the gap period. Tr. at 42. The evidence only shows that Robinson's bills were for $8.40 for half of 2003 and that leaves the other half of the year, and the previous two years, unaccounted for. Pl. Exh 1, at 08.

[23] Additionally, if Plaintiff's Exhibit One intended to include the records of the prior tenant, it is unclear why the account history depicted in Plaintiff's Exhibit One begins with the billing date of March 30, 2000 and thus does not list the February 02, 2000 or March 04, 2000 billing date that is reflected in Plaintiff's Exhibit Six. Pl. Exh. 1, at 08 and Pl. Exh. 6.

not prove Robinson's utilization of the electricity was done deliberately, intentionally and

with knowing disregard for Dominion's rights. *First Nat'l. Bank of Md. v. Stanley (In re

Stanley)*, 66 F.3d 664, 667 (4th Cir.1995) (holding that the plaintiff must prove that the

debtor's injurious act was done deliberately, intentionally and with knowing disregard for

plaintiff's rights). In order for the Court to conclude Robinson deliberately and intentionally

converted Dominion's electricity, it is necessary to determine from the evidence that

Robinson knowingly utilized the electricity with the intent to cause willful injury to

Dominion. The Court is simply unable to determine from the evidence here that because

Robinson never questioned the bills or electricity usage, Robinson therefore must have

known about the meter tampering and thus knowingly utilized the electricity with the intent

to cause willful injury to Dominion.

Dominion further argues that in 2004 Robinson received a monthly electric bill of

approximately $80.00 after the meter was replaced and did not question the bill is

circumstantial evidence of the fact that Robinson knew he was previously receiving un-billed

for electricity. Robinson testified that the reason he did not question the substantially higher

bill is because Dominion contacted him about the replacement of the meter. Further, he

stated that he got a letter from Dominion informing him that the meter at the Service Address

was defective. The evidence regarding the time-frame of the communication between

Robinson and Dominion is conflicting. The evidence is uncontested that Dominion replaced

the meter at the Service Address in January 2004. Therefore, if Robinson received the

43

approximately $80.00 dollar bill for electricity and the letter stating the meter at the Service

Address was faulty around the same time, he would have learned about the faulty meter

around February of 2004. Pl. Exh. 1, at 09. In contrast, McAllister testified that Dominion

did not contact Robinson until 2005. However, her testimony was difficult to interpret

regarding when Dominion contacted Robinson; thus, this Court is unable to determine a clear

time-line.[24] Further, if Dominion waited until 2005 to contact Robinson, the delay in

notification is perplexing and unexplained. The non-recording of the meter was discovered

in January 2004; thus, it makes little sense that Dominion would delay until 2005 to contact

Robinson. Given the aforementioned confusing testimony and the fact that this Court does

not have a copy of the initial communication between Dominion and Robinson, we cannot

know if the substantially higher electric bill and the initial communication were close in time.

If the electric bill and the initial communication to Robinson were close in time, it is certainly

understandable why Robinson did not contact Dominion about the substantially higher

electric bill - he would have known the meter had been replaced and thus the bills were

higher because of the new meter. Given the fact that the evidence is inconclusive regarding

when Dominion initially contacted Robinson, this Court does not find the fact that Robinson

---

[24] For example, counsel for Robinson asked McAllister whether Robinson was contacted
in early 2004, and McAllister testified "yes." Counsel for Robinson then followed-up his
question about whether Robinson was contacted in early 2004 by asking, "is that correct, or early
2005?" whereby McAllister responded "[w]e contacted him in 2005." Tr. at 35. In addition,
while the letter Robinson sent to Dominion accepting the $4056.39 debt is dated January 18,
2005 and references the fact that Robinson was notified via a letter that he owed the debt, this
January 18, 2005-letter does not state when Robinson was initially contacted by Dominion. Pl.
Exh. 9.

44

failed to question the substantially higher bill sufficiently probative of any "willful or malicious" intent.

Finally, Dominion argued that Robinson's agreement to pay the $4,056.29 debt is circumstantial evidence that Robinson knew he was receiving un-billed for electricity. Dominion alleges that it initially told Robinson that the $4,056.29 debt was for energy theft; however, Robinson alleges to the contrary. Nevertheless, Robinson does admit that he was told that the debt existed due to the meter failing to register the electricity consumed at the Service Address. Further, Robinson stated that after Dominion informed him of said debt, he called Dominion and requested a breakdown of the charges. Dominion provided Robinson with a breakdown of charges and Dominion alleges that this breakdown of charges indicated the debt was for "energy theft."[25] However, as previously discussed, the Court was not given a copy of the initial communication that Dominion sent to Robinson regarding the debt and Plaintiff's Exhibit Five is not dated; therefore, this Court is unable to determine what, if anything, Robinson was initially told regarding the debt.

Nevertheless, regardless of whether Robinson knew the demand of Dominion was for "energy theft," this Court finds that Robinson's acceptance of the debt does not establish that he intentionally and knowingly stole electricity. Robinson testified that he did not dispute the debt because he assumed he owed the money since Dominion told him the meter at the

---

[25] Dominion alleges that Plaintiff's Exhibit Five, "Dominion Virginia Power Investigated Energy Theft Summary of Related Charges," is a copy of the breakdown of the charges that Dominion provided to Robinson. Pl. Exh. 5.

Service Address had failed to record his electricity consumption. Additionally, Robinson

admits he received a benefit from the electricity; in fact, Robinson stated in his answer to

Plaintiff's Interrogatories: "[d]efendant believed the debt was owed because he, in fact, used

the electricity and relied on the accuracy and veracity of Dominion Virginia Power in

calculating the usage." Pl. Exh. 10, at 8. However, acknowledging that a benefit was

received and agreeing to pay for the benefit in hindsight does not lead to the inference that

the debtor must have intentionally converted the benefit. Further, Robinson testified that he

did not question Dominion about its basis for determining the meter had been tampered with

because he did not think it was within his rights. In addition, the evidence shows that

Dominion threatened to disconnect Robinson's service if he did not pay the debt by February

10, 2005.[26]   Pl. Exh. 4.   Therefore, given the aforementioned analysis, this Court is not

persuaded that the fact that Robinson accepted and acknowledged the debt constitutes

sufficient proof that he "maliciously and willfully" injured Dominion.

Weighing all the evidence, the Court is unable to conclusively determine Robinson's

conversion of Dominion's electricity was intentional as opposed to innocent or technical.

*Peklar v. Ikerd* (*In re Peklar*), 2001 WL 893681, at \*2 (finding an indebtedness

---

[26] Plaintiff's Exhibit Four is dated February 1, 2005; therefore, Robinson had already acknowledged the debt before Dominion threatened to disconnect his service. Pl. Exh. 4. As already discussed, this Court was not given a copy of Dominion's initial communication with Robinson; therefore, this Court has no way of determining whether Dominion alleged in that communication that "service [would] be disconnected" if Robinson failed to accept the debt. *Id.* Regardless of the timing, this Court finds the threat illustrative of the fact that many debtors would agree to pay such a debt in order to continue receiving service.

46

dischargeable where "[the debtor's] conversion of [the creditor's] property was at worst

negligent, and at best 'innocent or technical,' conversion."). Conversion cases require a

case-by-case analysis to determine whether the conversion is the result of negligent conduct

as compared to "willful and malicious" conduct. After doing such an analysis, this Court is

unable to conclusively determine Robinson deliberately and knowingly utilized Dominion's

electricity with knowing disregard for Dominion's rights. *Avco Fin. Servs. of Billings v.

Kidd (In re Kidd)*, 219 B.R. 278, 284 (Bankr. D.Mont. 1998) ("the key in conversion cases

is to analyze each set of circumstances on a case-by-case basis to determine whether the

conversion is in the nature of an intentional tort or whether the conversion is the result of a

negligent or reckless tort--but not willful or malicious.").

   In the case *sub judice* this Court is left with numerous unanswered questions and

evidentiary contradictions; therefore, the Court concludes Dominion failed to meet its burden

of proof under § 523(a)(6) of the Bankruptcy Code.

D.
§ 523(a)(2)(A)
*False Pretenses, False Representation, or Actual Fraud*

   Dominion asserts that Robinson's debt is nondischargeable as a debt arising from false

pretenses, false representation, or actual fraud. As this Court has previously held, to make

a debt nondischargeable under § 523(a)(2)(A), the plaintiff must prove the following

elements:

   (1) That the debtor made a representation;
   (2) That at the time the representation was made, the debtor knew the

47

representation was false;

(3) That the debtor made the false representation with the intention of deceiving the creditor;

(4) That the creditor relied on such representation; and

(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Bowden v. Elrod (In re Bowden)*, 326 B.R. 62, 82 (Bankr. E.D. Va. 2005); *In re McKnew*,

270 B.R. 593; *Fowler v. Garey (In re Garey)*, 258 B.R. 356, 360-61 (Bankr. E.D. Va. 2000);

*Parker v. Grant (In re Grant)*, 237 B.R. 97, 112 (Bankr. E.D. Va. 1999); *Spinoso v. Heilman*

*(In re Heilman)*, 241 B.R. 137, 149 (Bankr. D.Md. 1999); *Hecht's v. Valdes (In re Valdes)*,

188 B.R. 533, 535 (Bankr. D.Md. 1995); *Clarkson v. Elibuyuk (In re Elibuyuk)*, 163 B.R. 75,

76 (Bankr. E.D. Va. 1993).[27]  Further, a plaintiff bringing an action under § 523(a)(2)(A)

must prove each of the aforementioned elements by a preponderance of the evidence.

*Grogan v. Garner*, 498 U.S. 279, 291 (1991).

## 1. Did Robinson Make a Representation?

Representations are either express or implied. "A false representation is an express

misrepresentation, while a false pretense refers to an implied misrepresentation of 'conduct

intended to create and foster a false impression.'" *National Bank of North America v.*

*Newmark (In re Newmark)*, 20 B.R. 842, 854 (Bankr. E.D.N.Y. 1982) (quoting *H.C. Prange*

---

[27] As these cases illustrate and most recently *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999), demonstrates, the Fourth Circuit analyzes § 523(a)(2)(A) by strictly focusing on misrepresentations. The Seventh Circuit and the Sixth Circuit Bankruptcy Appellate Panel adopted a broader definition of § 523(a)(2)(A), such definition includes general tricks and deceit rather than only misrepresentations. *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001).

48

*Co. v. Schnore (In re Schnore),* 13 B.R. 249, 251 (Bankr. W.D. Wis. 1981)). As this Court

held in *In re Grant,* 237 B.R. at 113, and *Household Fin. Corp. v. Kahler (In re Kahler),* 187

B.R. 508, 512 (Bankr. E.D. Va. 1995), § 523(a)(2)(A) does not require any overt

misrepresentation; this Court may imply such a misrepresentation from the debtor's silence.

There is no evidence that Robinson made any express or overt false representations

to Dominion. For example, there is no evidence that Robinson made any false statements

regarding his electricity usage or billing to Dominion during the period of time when the

alleged unauthorized energy usage was occurring. Therefore, this case is distinguishable

from cases where the debtor verbally represented something to the creditor but then engaged

in activities that contradicted his express statements. *In re McKnew,* 270 B.R. at 619

(holding the debtor's actions constituted a misrepresentation where the debtor represented

to the creditor he would only use the loan money as factoring capital but then used the funds

for other purposes).

If the evidence established that Robinson had tampered with the meter, the Court

would have to consider whether his tampering and subsequent acceptance and payment of

the electric bill was a misrepresentation intended to create and foster a false impression that

the meter was registering electricity properly. However, while Dominion presented some

circumstantial evidence which tends to suggest Robinson tampered with meter or knew the

meter had been tampered with, there was also evidence presented at trial that suggests

Dominion has no idea nor any ability to prove who tampered with the meter. Further,

49

Dominion admitted that it cannot prove Robinson actually tampered with the meter. After

weighing all the evidence, the Court concludes the circumstantial evidence does not equate

to a finding that Robinson tampered with the meter or had knowledge of the meter

tampering.[28] Therefore, what distinguishes this case from many other § 523(a)(2)(A) cases

is the fact that there is no proof that Robinson engaged in any physical or verbal affirmative

act. *See generally Elrod v. Bowden (In re Bowden)*, 326 B.R. 62, 85 (Bankr. E.D. Va. 2005)

(finding the debtor made an affirmative statement which the Court found to be implied

misrepresentations regarding the purpose of the loan); *In re McKnew*, 270 B.R. at 618

(finding the debtor made misrepresentations by promulgating false financial information).

Dominion argues that even without direct proof that Robinson tampered with the

meter, Robinson is nevertheless liable under § 523(a)(2)(A) because Robinson knew that he

was not being accurately billed for his electricity usage and Robinson's subsequent use of

the electricity was fraudulent. Further, Dominion argues that Robinson's failure to disclose

the fact that his bills were inaccurate constitutes fraud and a misrepresentation. Robinson,

on the other hand, argues that his failure to contact Dominion regarding his electric bills is

not fraudulent; rather, it is indicative of the that he never paid much attention to his bills. In

addition, he argues that this is the first time he has ever lived alone, he always paid his bills

in person and in cash, he did not realize his bills reflected zero usage and he assumed

---

[28] See pages 36-47 for further discussion of this Court's weighing of the circumstantial
evidence and conclusion that the evidence does not establish that Robinson engaged in meter
tampering or had knowledge of the tampering.

Dominion was billing him correctly. Further, Robinson, through counsel, argues that any duty to correct improper billing resides with Dominion.

This Court has previously held that "[f]raud and misrepresentation may be established by a failure to disclose on the part of the debtor where such failure creates a false impression which is known by the debtor." *In re McKnew*, 270 B.R. at 618-619; *Caldwell v. Hanes (In re Hanes)*, 214 B.R. 786, 809 (Bankr. E.D. Va. 1997) (citing *O'Connor, CPO v. Booker (In re Booker)*, 165 B.R. 164 (Bankr. M.D.N.C. 1994)). While fraud can be established by a failure to disclose, there must first be a finding that the debtor knew his conduct was creating a false impression. *Id.* Further, this Court concludes the debtor must not only *know* his conduct is creating a false impression but that the debtor must have also engaged in some initial activity that created the impression. For example, in *In Re Booker* the debtor made representations about the funds initially, which created a false impression, and thus the court held he had a responsibility to correct the misrepresentation that he created. *In re Booker*, 165 B.R. at 169 (finding the debtor liable because he overtly represented that the money would be used for certain investments and further his failure to correct the misrepresentation equated to an omission); *Kahler v. Household Fin. Corp. (In re Kahler)*, 187 B.R. 508, 512 (Bankr. E.D. Va. 1995) (finding that the debtor cashing the check implied that the debtor could pay the debt).

There is some circumstantial evidence that indicates that Robinson may have been aware that his electric bills were unusually low; however, that alone does not prove Robinson

51

engaged in meter tampering. Nor does the fact that Robinson's bills were unusually low

prove that Robinson thus must have realized that someone tampered with the meter. The

Court will not rehash its discussion of the circumstantial evidence except to note that the

Court concluded during its discussion of § 523(a)(6) that the circumstantial evidence does

not establish by a preponderance of the evidence that Robinson must have had knowledge

of the tampering and thus fraudulently used the unmetered electricity service. Further, the

evidence does not establish that Robinson's failure to notify Dominion about his bills

constitutes an omission that equates to a representation. This Court concludes that this case

is distinguishable from most other cases where misrepresentations were implied by silence.

For example, merely paying a utility bill as it comes due is distinguishable from a case where

the debtor had a independent duty to disclose information. *Trizna & Lepari v. Malcolm* (*In

re Malcolm*), 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992) (holding that the debtors were liable

for knowingly making a false representation because they had a duty to disclose all creditors

on their bankruptcy filing and failed to comply with this duty).    This case is also

distinguishable from cases where the debtor's actions imply particular facts about the debtor

and thus the debtor has a duty to correct what would otherwise be a false impression. *In re

Kahler* 187 B.R. at 512 (holding that the debtor's failure to disclose his financial troubles

before he cashed a check from the creditor constituted a misrepresentation as the cashing of

the check created the false impression that he could pay). Without evidence that Robinson

engaged in meter tampering, merely paying the electric bill as it came due is not a

52

misrepresentation. By paying the bill, Robinson was not representing or implying the accuracy of the bill. Further, by merely paying the bill, Robinson was not representing that the bill was for the correct amount.

For the reasons discussed above, Dominion did not meet its burden of convincing the Court that Robinson made a false representation or engaged in fraudulent conduct. Therefore, the first element of § 523(a)(2)(A) has not been satisfied, and since all of the elements must be proven in the conjunctive under § 523(a)(2)(A) in order for a debt to be declared non-dischargeable, Dominion has failed to persuade the Court that this provision is applicable. However, for the exercise of analyzing Dominion's claim in its entirety, the Court will consider the remaining elements of § 523(a)(2)(A).

2. Did Robinson know the Representation was False?

To make a debt non-dischargeable, the plaintiffs must prove the debtor knew or should have known the representation was false when made. *Koma v. Brooks (In re Brooks)*, 4 B.R. 237, 238 (Bankr. S.D. Fla. 1980); *Berk v. Stewart (In re Stewart)*, 10 B.R. 214, 217 (Bankr. C.D. Cal. 1981). For the reasons stated above in the discussion of whether Robinson made a false representation, merely paying his electric bill does not equate to a finding that Robinson was making a false representation. Therefore, given that Dominion did not persuade the Court that Robinson engaged in any initial act beyond paying the bills generated by Dominion, the Court concludes that the second element of nondischargeability under Section 523(a)(2)(A) is not satisfied.

53

### 3. Did Robinson Intend to Deceive?

"Because direct proof of intent (i.e. the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Universal Bank, N.A. v. Grause (In re Grause)*, 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000) (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987)); s*ee also Marunaka Dainichi Co. Ltd. v Yamada (In re Yamada)*, 197 B.R. 37 (Bankr. E.D. Va. 1996); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 465 (Bankr. E.D. Va. 1992). This Court has held if the "debtor recklessly makes false representations that he should know will induce another to rely thereon, intent to deceive may be inferred for purposes of § 523(a)(2)(A)." *In re Grant*, 237 B.R. at 115 (citing *In re Kahler*, 187 B.R. 508, 513 (Bankr. E.D. Va. 1995)).

This Court has also previously held that "the Court may infer intent to deceive from the surrounding circumstances." *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 620 (Bankr. E.D. Va. 2001) (citing *In re Gant*, 237 B.R. at 115; *In re Yamada*, 197 B.R. at 39). Dominion alleges that the circumstantial evidence provides proof of Robinson's fraudulent intent. However, as previously discussed, Dominion did not prove circumstantially to this Court that Robinson tampered with the meter or that Robinson had knowledge of the tampering. Further, for the reasons stated regarding whether Robinson made a false representation, this Court concludes that merely paying the electric bill without notifying Dominion is not proof of fraudulent intent. Therefore, the Court concludes that Dominion

did not persuade the Court that the evidence establishes that the third element of Section

523(a)(2)(A) has been met in this case.

4. Did Dominion Justifiably Rely on the Representations ?

Assuming *arguendo* that Dominion has proven the first three elements, Dominion

must further prove that it relied on Robinson's representations. The Supreme Court has held

that a plaintiff must prove he justifiably relied on the debtor's representations in order to

succeed under § 523(a)(2)(A). *Field v. Mans (In re Field)*, 516 U.S. 59, 73-74 (1995).

"Justification is a matter of the qualities and characteristics of the particular plaintiff, and the

circumstances of the particular case, rather than of the application of a community standard

of conduct to all cases." *Id.* at 71. "A buyer's reliance on this factual representation [seller's

statement the land is free of encumbrances] is justifiable, even if he could have 'walked

across the street to the office of the register of deeds in the courthouse' and easily have

learned of an unsatisfied mortgage." *Id.* (quoting Restatement (Second) of Torts § 540

(1976) Illustration 1). This definition of reliance is not without limits; a creditor "cannot

recover if he blindly relies upon a misrepresentation the falsity of which would be patent to

him if he had utilized his opportunity to make a cursory examination or investigation." *Id.*

(quoting Restatement (Second) of Torts § 541 (1976) Comment a).

Dominion argues that it relied on Robinson's payment of the electricity bill as an

indication that Robinson was being properly billed.  Further, Dominion alleges in its

Complaint that Dominion relied on the meter readings provided by the tampered meter with

55

respect to the quantity of electricity being used at the Service Address. Pl. Compl., at 4. As

previously discussed, in order for Dominion to even begin to convince the Court that it relied

on the tampered meter or Robinson's payment as a representation, Dominion would have to

convince the Court that Robinson engaged in meter tampering or had knowledge of the

tampering. However, even assuming *argumendo* that Dominion had proven that Robinson

engaged in meter tampering and subsequently continued to receive the benefit of the

unregistered electricity, Dominion's reliance argument is flawed.

        As this Court has previously held, "plaintiffs are not required to continually look over

an entity's shoulder." *In re McKnew*, 270 B.R. at 621. Further, as was held in *In re Biondo*,

a sophisticated entity is not required to examine financial statements but can justifiably rely

upon the debtor's representation. *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126,

135 (4th Cir. 1999) (citing *In re Field*, 516 U.S. at 70). However, this justifiable reliance is

not without limits and it does not give a creditor blanket permission to blindly rely upon

obvious falsities. *In re Field*, 516 U.S. at 71. Additionally, "[t]o prove justifiable reliance,

a creditor must have shown some degree of diligence . . . ." *Koep v. Guar. Residential

Lending, Inc. (In re Koep)*, 334 B.R. 364, 372 (Bankr. D.Md. 2005) (quoting *Boyd v. Loignon

(In re Loignon)*, 308 B.R. 243, 249 (Bankr. M.D.N.C. 2004). Furthermore, "the plaintiff is

required to exercise some judgment." *Id.* (denying summary judgment, in part, because the

court was not convinced that the creditor, who was a financial institution in the business of

reviewing loan applications, could have justifiably relied on the debtor's false

56

representations) (citing *In re Field*, 516 U.S. at 71).

As previously stated, "[j]ustification is a matter of . . . the circumstances of the particular case . . . ." *In re Field*, 516 U.S. at 71 (quoting Restatement (Second) of Torts § 545A (1976), Comment b.). The circumstances of this particular case indicate that Dominion did not justifiably rely on the debtor, since Dominion has a responsibility to oversee its own meter and billing invoices.

Dominion acknowledges that it did not realize that the meter was failing to register electricity until approximately January 2004, even though the meter allegedly failed to record the utility being used at the Service Address since at least June of 2001. Stipulations of Fact, at 1. Further, Dominion admits that the meter is read every month by a meter reader employed by Dominion. In addition, Robinson alleges that he paid his monthly bill in cash at a Dominion service center. While the general rule is that creditors do not have to constantly verify every representation that the debtor makes, justifiable reliance is not without its limits and a creditor is "required to use his senses and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him." *In re Field*, 516 U.S. at 71 (quoting the Restatement (Second) of Torts § 541 (1996)).

While the failure of the meter to register electricity might not have been a patent indicator of fraud initially, it appears to this Court that at some point over a two and half year period Dominion should have determined such a meter reading, whereby the meter recorded zero electricity usage, was worthy of investigation. In addition, since Robinson alleges he

57

paid his bills in cash, it is difficult for this Court to comprehend why during that two and half

year time period a Dominion representative never investigated the reason Robinson was only

paying $8.40. Further, and perhaps more importantly, its necessary to distinguish that this

is not a case where the debtor made false statements about his own financials; rather this is

a case where the very bills that were allegedly "misrepresentations" were created by the

creditor.    Additionally, this is not a case where the creditor received numerous

representations from the debtor and thus its understandable that one indicator of fraud is

"hardly sufficient to negate the numerous other circumstances which justified [the creditor's]

reliance on [the debtor's] misrepresentations." *In re McKnew*, 270 B.R. at 622.

This case is also fundamentally different than other tampering cases, because the

instrumentality in this case belonged to the creditor not the debtor. Dominion, unlike the

typical plaintiff, was in a position to investigate "red flags." Dominion's disregard of the

"red flags," dictates that Dominion's reliance on Robinson was not justified. *Giovanni v.*

*Grayson, Kubli & Hoffman, P.C. (In re Giovanni)*, 324 B.R. 586, 594 (E.D. Va. 2005) (citing

*In re Anastas*, 94 F.3d 1280, 1286 (9th Cir. 1996) (stating . . . "disregard of 'red flags' falls

below the justifiable-reliance standard").

Under the present facts, even if Robinson knew about the inaccuracy of the bills,

Dominion was not justified in relying on Robinson's payment as evidence of the accuracy

of the bill or meter. Robinson's meter readings and electrical bills should have been "red

flags" to the monthly meter readers and to any Dominion representative who processed the

bills and accepted payment from Robinson. Dominion argues that the fact that meter was

recording zero electricity usage was not a "red flag" because its not unusual for accounts to

have zero usage. Further, McAllister testified that "when somebody moves out, the account

will record nothing." Tr. At 23. While this Court understands that a period of a few months

of zero usage might not be a red flag, this Court concludes that a period of approximately two

and a half years surely should have raised a "reg flag." It would be inequitable to allow

Dominion to act unreasonably and untimely in its investigation of fraud yet nevertheless

except the debtor's debt from discharge. *In re Kahler*, 187 B.R. at 515 (holding that a

creditor has a duty to make some inquiry into a debtor's financial condition before extending

credit and discussing that "disallowing a non-dischargeability claim when the financial

institution fails to investigate would best comport with the intent of Congress . . . "). For the

aforementioned reasons, even assuming a misrepresentation occurred, Dominion failed to

persuade the Court that it justifiably relied on the misrepresentation; thus § 523(a)(2)A) is

not applicable.

5. Did Dominion's Damages Proximately Result from Robinson's Representations

If the Court had found that Robinson's actions satisfied the other elements of §

523(a)(2)(A), the final issue would be whether or not the plaintiff's harm resulted from the

debtor's representations. Proximate cause is both (1) causation in fact "loss suffered by one

who justifiably relies upon the truth of the matter misrepresented, if his reliance is a

substantial factor in determining the course of conduct that results in his loss;" and (2) legal

causation, "if the loss might reasonably be expected to occur from the reliance." Restatement (Second) of Torts §§ 546, 548A; *see also In re Britton*, 950 F.2d 602, 604 (9th Cir. 1991); *In re Grant*, 237 B.R. at 117; *Shannon v. Russell* (*In re Russell*), 203 B.R. 303, 313 (Bankr. S.D. Cal. 1996).

Assuming *arguendo* that Robinson made a misrepresentation and this misrepresentation led to Dominion's inaccurate billing of Robinson, there is a causal connection between the misrepresentation and Dominion's harm. The misrepresentation impaired Dominion's ability to collect its proper payment from Robinson; therefore, Dominion's collection ability and profit from providing the electricity service was reduced by the misrepresentation. Unlike in some cases, the financial loss in the case *sub judice* makes it apparent that there was a direct relationship between the creditor's loss and the debtor's actions. *See In re Grant*, 237 B.R. at 97; *Kaufman v. Vamvakaris* (*In re Vamvakaris*), 197 B.R. 228, 231 (Bankr. E.D. Va. 1996) (the plaintiff failed to show any causal connection between the harm and the misrepresentation). Therefore, assuming Robinson made a misrepresentation, his misrepresentation precluded Dominion from receiving proper payment on the electrical service provided, and thus, Dominion was proximately harmed by Robinson's actions. However, since Dominion failed to satisfy all of the elements required under § 523(a)(2)(A) of the Bankruptcy Code, § 523(a)(2)(A) is no bar to Robinson in regards to discharge of the indebtedness.

60

## D.
## Attorney Fees

Robinson, in his Response to Dominion's Complaint, requested that the Court award

him reasonable legal fees and costs. Response to Compl., at 1-2. However, Robinson did

not raise the issue of legal fees and costs at trial. Further, he presented no evidence to the

Court regarding the amount of fees requested or the reasonableness of fees.

Additionally, ignoring the evidentiary problem, the Court finds that Dominion's

Complaint was substantially justified and thus the parties should be responsible for their own

costs and fees. Section 523(d) of the Bankruptcy code provides:

> If a creditor requests a determination of dischargeability of a consumer debt
> under subsection (a)(2) of this section, and such debt is discharged, the
> court shall grant judgment in favor of the debtor for the costs of, and a
> reasonable attorney's fee for, the proceeding if the court finds that the
> position of the creditor was not substantially justified, except that the court
> shall not award such costs and fees if special circumstances would make the
> award unjust.

11 U.S.C. § 523(d) (2005). The circumstantial evidence presented, while not enough to meet

Dominion's preponderance of evidence burden, indicates that Dominion had a reasonable

basis for bringing the Complaint. *See generally Walker v. Star USA Fed. Credit Union* (*In

re Walker*), 299 B.R. 141 (S.D. W.Va. 2003). The Court therefore concludes that Dominion

had substantial justification for bringing the Complaint; thus, Robinson is not entitled to

attorney fees and costs. *Id.*

V.
SUMMARY

The Court has great sympathy for Dominion given the frustration and annoyance it experiences whenever a customer utilizes its services without paying for it. Dominion's efforts to curb fraud are commendable. However, in the end, the Court was presented with a particularly challenging factual scenario, but was not given all the necessary pieces to solve the puzzle. For the aforementioned reasons, the Court concludes that Dominion failed to meet its burden of proof pursuant to §§ 523(a)(2) and (a)(6). Therefore, the Dominion Debt is dischargeable. Robinson is not entitled to attorney fees and costs pursuant to § 523 (d) because Dominion had substantial justification for bringing the Complaint.

A separate order will issue.

The Clerk shall direct copies of this Memorandum Opinion to John M. Craig, Esquire, Counsel for the Plaintiff, and Glenn R. Tankersley, Esquire, Counsel for the Defendant.

Entered:    3/17/06

STEPHEN C. ST. JOHN
United States Bankruptcy Judge

NOTICE OF JUDGMENT OR ORDER
Entered on docket
3 | 17 | 06